UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GONZALES COMMUNICATIONS, INC., a Kansas Corporation,<br><br>　　　　　　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>TITAN WIRELESS, INC., a Delaware Corporation, TITAN CORPORATION, a Delaware Corporation, TITAN AFRICA, INC., a Delaware Corporation, GEOLUTION INTERNATIONAL, INC., a Delaware Corporation,<br><br>　　　　　　　　　　　　　　Defendants. | CASE NO. 04-CV-00147 WQH (WMc)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

HAYES, Judge:

**I.　　Introduction**

　　The matter before the Court is Defendants' Motion for Summary Judgment (doc. no. 84). This case arises out of a failed telecommunications venture involving Plaintiff Gonzales Communications, Inc. ("GCI") and Defendants in the West African nation of Guinea. Plaintiff filed this lawsuit on January 23, 2004, and filed an Amended Complaint on March 15, 2004. GCI's Amended Complaint alleged the following nine claims: (1) declaratory relief; (2) recission - fraud against Defendant Titan Wireless, Inc. ("TWI"); (3) fraud against Defendants TWI and Titan Corporation ("Titan"); (4) negligent misrepresentation against TWI and Titan; (5) unjust enrichment against TWI and Titan; (6)

breach of contract against TWI; (7) breach of contract against Defendant Geolution International, Inc. ("Geolution"); (8) breach of implied covenant of good faith and fair dealing against Defendant TWI; and (9) tortious interference with contractual and business relationships against Defendants TWI, Titan, Geolution, and Titan Africa, Inc. ("Titan Africa"). (*See* doc. no. 4.) On July 11, 2005, the Court granted summary judgment in Defendants' favor as to GCI's second, third, and ninth claims. (*See* doc. no. 51.)

Defendants' filed a second Motion for Summary Judgment (doc. no. 84), which seeks dismissal of GCI's remaining causes of action, and summary judgment in Defendants' favor on three of their counterclaims: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) unjust enrichment. The Court heard the parties' oral arguments on July 21, 2006.

## II.  Background

### A.  The Guinea Project

In May of 1998, GCI president Alfred Gonzales met the ambassador of the Republic of Guinea at a reception in Washington, D.C., and was eventually offered the opportunity to provide telecommunications services to the Republic of Guinea. (Gonzales Decl. ¶¶ 7-8.) GCI subsequently approached Titan as a possible partner company possessing the technical expertise and experience, particularly in Africa, that would enable GCI to install a satellite telecommunications system in Guinea. (*Id.* ¶ 7.) In early 2001, GCI and TWI discussed the possibility of developing a wireless telecommunications network in the Republic of Guinea. (*See* Gonzales Dep. 21:18-22:9.) According to Gonzales, after a joint visit by GCI and TWI representatives to Guinea,

> it was decided that Titan was going to provide a complete turn-key system. Titan helped us plan the frequency there, as well as cities and locations that would be best to start in. In my view, we had a decent game plan based on Titan's participation as to how much equipment we would need, locating that equipment and what would be built first to generate the most revenue so that we could pay for existing equipment and expand from there.

(Gonzales Decl. ¶ 16.)

### B.  The April 2001 Proposal

On April 24, 2001, following discussions, research, site visits in Guinea, TWI submitted to GCI a 103-page document entitled "Domestic International Satellite Communications Network in

the Republic of Guinea Proposal" (the "April 2001 Proposal"). (*See id.* 23:9-17, 25:4-8, 55:23-56:5; Ramirez Decl. ¶ 5; Kitchen Decl., Ex. C (Req. for Admis., Ex. 1).) Appendix 10.3 of the April 2001 Proposal set forth the following unexecuted "Contractual Documents": (1) "General Information – Terms and Conditions of Offer/Sale" (Appendix 10.3.1); (2) "Statement of Work" (Appendix 10.3.2); (3) "Equipment Purchase Agreement" (10.3.3); and (4) "Specifications for the Guinea Network" (Appendix 10.3.4). (Kitchen Decl., Ex. C (Req. for Admis., Ex. 1).) Beneath the heading "Scope," the first paragraph of the Statement of Work included in the April 2001 Proposal provided as follows:

> This statement of Work (SOW) defines the effort required for the design, engineering development, fabrication, test, and installation of a *Wireless Local and International Telephone System* for the *Republic of Guinea Program* for the *Kansas City Teleport, Conakry & 40 VSATs, and 7 Mini-Hubs* Phases. The effort includes the associated program management and training[.]

(*Id.* (emphasis in original).) The Statement of Work attached to the April 2001 Proposal provided for TWI to design, develop, and install a satellite communications system and provide related system support and services. (*See id.*) Appendix D, section 10.4 of the April 2001 Proposal, entitled "Guinea Trip Report," notes that "Gonzales was inexperienced in wireless technology," and further states: "In all cases, Titan Wireless shall be the systems provider/integrator." (*Id.*)

The April 2001 Proposal was not intended to constitute a final expression of GCI and TWI's agreement relating to a telecommunications project in Guinea. (Pl.'s Admis. no. 1.)

**C.   The EPA**

Between April and June of 2001, GCI attempted to secure financing in order to finance the Guinea wireless network project contemplated in the April 2001 Proposal. (Pl.'s Admis. no. 3.) However, GCI ultimately informed TWI that it would not be able to obtain the necessary funding for the project contemplated in the April 2001 Proposal. (Pl.'s Admis. no. 4.) GCI and TWI then abandoned the April 2001 Proposal (Pl.'s Admis. no. 5), and instead negotiated and executed a contract entitled Equipment Purchase Agreement (the "EPA"), dated June 19, 2001 (Pl.'s Admis. no. 6). This document was a slightly altered version of the EPA that had been included as one of the "Contractual Documents" in the April 2001 Proposal. (*See* Kitchen Decl., Ex. C (Req. for Admis., Ex. 1).) On June 8, 2001, TWI Director of Contracts Hank Ramirez transmitted an email

to Gonzales attaching the EPA and four additional contractual documents. (Ramirez Decl., Ex. A.) In the email, Ramirez stated: "Titan Wireless hereby provides the attached Word (4) and Excel (1) files representing our revised offer replacing all prior offers, verbal or written, in their entirety." (*Id.*)

The EPA's recitals state that "Seller [TWI] agrees to sell certain equipment" and that "Purchaser [GCI] desires to purchase such equipment from the Seller," and provides for the sale of specified equipment. (Ramirez Decl., Ex. C.) Under the heading, "Agreement," the EPA states:

> The terms and conditions contained in this document, together with other documents described below, collectively constitute an agreement (hereinafter referred to as the "purchase agreement") relating to the purchase of products by the Purchaser. The purchase agreement shall consist of the terms and conditions set forth herein, as well as any product specifications, manufacturing, and quality assurance specifications and other terms referenced herein.

(*Id.*)

Under the heading, "Applicable Documents," the EPA states: "The following documents form part of this Agreement: **a.** Statement of Work, dated 06/08/01; **b.** Acceptance Test Methodology, dated 06/08/01; **c.** Terms and Conditions of Offer/Sale, dated 05/25/01." (*Id.*) The draft EPA attached as Appendix 10.3.3 to the April 2001 Proposal, had listed the following "Applicable Documents": "**a.** Statement of Work, dated 04/24/01; **b.** Performance Specification, dated 04/24/01; **c.** Domestic and International Satellite Communications Network in the Republic of Nepal [sic], dated 04/24/01; **d.** Equipment Purchase Agreement, dated 04/25/01; **e.** Terms and Conditions of Offer/Sale, dated 01/19/01." (Kitchen Decl., Ex. C (Req. for Admis., Ex. 1).) The EPA contains the following provision, set forth beneath the heading "Complete Agreement":

> Unless otherwise agreed to in writing, the terms and conditions of this Agreement shall govern all shipments of products purchased by the Seller from the Purchaser and are the final expression and shall constitute the complete and exclusive statement of the agreement between Seller and Purchaser with respect to the products and/or services provided by the Seller. No agreement concerning modified or additional terms and conditions will be binding upon either party unless made in writing and signed by each party's authorized representative. This Agreement shall be construed in accordance with the laws of the State of California.

(*Id.*)[1]

---

[1] The Court assumes that the language stating that the agreement governs shipments of products "purchased by the Seller from the Purchaser," as opposed to vice versa, is a scrivener's error.

### *The SOW*

The Statement of Work ("SOW") attached to the June 2001 EPA differs markedly from that attached to the April 2001 Proposal, and contains no express statement of scope providing for TWI to design, develop, install and administer a satellite communications system. Instead, the June 2001 SOW sets forth a description of "Phase I" of the Guinea project, a list of 21 "Assumptions," and an "SOW Matrix" setting forth various tasks pertaining to the project and assigning responsibility for each to either Purchaser (GCI), Seller (TWI), or Seller's Subcontractor. (Ramirez Decl., Ex. C.) Under the heading "Overall," however, the SOW Matrix does assign responsibility to Seller (TWI) for "System Design, Equipment Lists, Order Equipment, Training, Documentation, . . . Optimizations (see below)." Purchaser is designated as responsible for "Financing, Shipping, Taxes, Insurance, Inspection, Customs Clearing, Warehousing, Delivery of Equipment to Site." (*Id.*) Seller and Purchaser (GCI) are both designated as responsible for "Installations (see below)" and "ATP." (*Id.*) The SOW Matrix is then divided into additional headings bearing the names of six project locations: Kansas City, Conakry, Labe, Sengaredi, Bofa, and Farignia. (*Id.*) Seller's responsibilities under these headings appear to consist mainly of the installation of designated pieces of telecommunications equipment at the locations named. (*Id.*)

### *The TCOS*

The document entitled Terms and Conditions of Offer/Sale (the "TCOS"), which is listed among the "Applicable Documents" forming part of the EPA, contains the following "Limitation of Liability":

> TITAN WIRELESS AND ITS SUPPLIERS SHALL NOT BE LIABLE UNDER ANY THEORY AT LAW, IN EQUITY OR OTHERWISE FOR ANY SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES (EVEN IF TITAN WIRELESS HAS BEEN ADVISED OF SAME) INCLUDING, WITHOUT LIMITATION LOST PROFITS OR REVENUES. THE ENTIRE LIABILITY OF TITAN WIRELESS FOR ANY CLAIM, LOSS OR DAMAGES UNDER ANY THEORY AT LAW, IN EQUITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, CONTRACT, TORT, NEGLIGENCE AND STRICT LIABILITY, ARISING OUT OF THIS AGREEMENT OR ANY INDEMNIFICATION OBLIGATION THEREOF, THE PERFORMANCE OR BREACH THEREOF, OR THE SUBJECT MATTER THEREOF SHALL NOT IN ANY EVENT EXCEED THE SUM OF THE PAYMENTS ACTUALLY MADE BY PURCHASER TO TITAN WIRELESS PURSUANT TO THIS AGREEMENT. ANY ACTION AGAINST TITAN WIRELESS MUST BE BROUGHT WITHIN ONE(1) YEAR AFTER THE CLAIM AROSE.

(*Id.*)  An identical provision appeared in the version of the TCOS that was attached to the April 2001 Proposal.  No similar provision limits GCI's liability.

In addition, under the heading "C. Installation," the TCOS states: "Basic installation is not included in the purchase price unless it is specifically itemized."  (Ramirez Decl., Ex. C.)  Further, section (VIII)(N) of the TCOS, entitled,"Inspection and Acceptance," states:

> Acceptance occurs upon delivery.  The Purchaser shall inspect the goods and services promptly after receipt thereof and shall notify Seller in writing within ten (10) days of receipt of the goods and services of any claim for shortage or failure of the goods and services to meet the requirements of the purchase Contract.  If no such notice is given by the Purchaser to Seller, it will be deemed conclusively that there are no shortages and that the goods and services conform to the requirements of the Contract and the Purchaser will be liable for payment therefor in accordance with the terms of the Contract.

(*Id.*)

However, the "Acceptance Test Plan" document, which is also part of the EPA, provides for TWI to devise an Acceptance Test Plan ("ATP") within 60 days after the contract becomes effective, pursuant to which TWI would conduct, and GCI witness, the testing of the equipment sold.  (*See id.*)  The Acceptance Test Plan states:

> The purpose of an Acceptance Test Plan (ATP) document is to demonstrate to the Customer that the Customer has received all equipment that he has purchased in the contract and that all the purchased equipment is functioning in accordance with the manufacturer's standards.  The ATP proves the integrity of the purchased equipment's operation and level of quality.  The completion of the ATP demonstrates to the Purchaser that the purchased equipment is operating in accordance with the manufacturer's standards. . . . The Seller will conduct the ATP and the Purchaser will simultaneously witness the ATP.

(*Id.*)

### *Price, Payment and "Milestones"*

Under the heading, "Price," the EPA states that "Purchaser agrees to pay to the Seller $4,685,382 USD . . . ."  (*Id.*)  Under the heading, "Payment," the EPA provides for payments to be made "via an irrevocable letter of credit, immediately payable and negotiable at the counters of a US bank upon presentation of a copy of Seller's letter stating that one or more of the following milestones have been completed . . . ."  (*Id.*)

The first Milestone, "Agreement Effectivity," calls for payment of 20% of the contract price.  (*Id.*)  Under the earlier heading "Effectivity," the EPA states: "This Agreement shall

become effective upon signing by both Parties authorized representative [sic] and upon Seller's receipt of an irrevocable letter of credit acceptable to the Seller." (*Id.*) Soon after execution of the EPA, GCI proved unable to obtain a letter of credit. Nevertheless, TWI continued to deliver equipment to GCI pursuant to the terms of the EPA. (Pl.'s Admis. no. 7.) In addition, as discussed below, the parties entered into an additional agreement providing for deferred payment.

The second Milestone set forth under the "Payment" heading of the EPA comprises six sub-parts, each of which represents the inspection and shipment of equipment to the six locations set forth in the SOW Matrix: Kansas City, Conakry, Labe, Sengaredi, Bofa, and Farignia. (*Id.*) The second Milestone calls for six payments, totaling 60% of the contract price. (*Id.*) Under the heading, "Delivery," the EPA sets forth the "Milestone Completion" date for these inspections and shipments as "Day 60 After Agreement Effectivity." (*Id.*)

The third Milestone accounts for 15% of the contract price, and is also divided into six subparts, representing installation of the equipment at the six above-named locations. (*Id.*) The "Milestone Completion" date for Milestone 3 is listed as "Day 90 After Agreement Effectivity." (*Id.*) The fourth Milestone, accounting for 5% of the contract price, is entitled "Installed Sites Final Acceptance"; its designated "Milestone Completion" date is "Day 105 After Agreement Effectivity." (*Id.*)

### D. Review of EPA by GCI's Lawyers

GCI's lawyers prepared a memorandum analyzing the EPA, dated June 17, 2001. (Ramirez Decl., Ex. B.) In the memorandum, GCI's attorneys commented regarding the fact that the TCOS limited TWI's but not GCI's liability, noting that the EPA "entirely limits Titan's liability and prohibits punitive, incidental or consequential damages, including lost profits, and also forecloses the potential for a remedy in equity." (*Id*.) Furthermore, GCI's lawyers noted that no "provision of the Agreement describes the method for handling failure to meet the 'estimated milestone completion' date. . . . This [is] especially true given that the 'Terms & Conditions' document states that the average delivery time takes 90-180 days after ordering." (*Id.*) In addition, GCI's attorneys commented that section (VIII)(N) of the TCOS "states that upon delivery, Gonzales accepts the goods. Gonzales is still allowed ten days to notify Titan of any shortages or problems,

but there is no mention of a right to reject after delivery. This should be altered to protect Gonzales' right to reject or require different shipments." (*Id.*)

GCI executed the EPA without negotiating any alterations to its terms.

### E.  The DPSA

As noted above, GCI proved unable to obtain the letter of credit provided for in the EPA. On this basis, GCI president Gonzales asserts that the EPA never came into force, declaring that the EPA "was broken as the result of the failure of GCI to obtain financing. Titan came back to us with a new proposal as to how to get the system up and running, using a modular approach. . . . I do not consider the June, 2001 agreement to be the operative document memorializing GCI's relationship with Titan . . . ." (Gonzales Decl. ¶¶ 23-24.)

However, in August of 2001, as a substitute for the letter of credit, GCI and TWI executed a "Deferred Payment and Security Agreement" (the "DPSA"), dated August 23, 2001. (Pl.'s Admis. no. 8; Gonzales Dep. 95:7-12 (confirming that the DPSA was executed as a substitute for the irrevocable letter of credit provided for under the terms of the EPA).) GCI and TWI executed the DPSA to establish deferred payment terms upon which GCI could purchase equipment and services as set forth in the EPA, and to establish the method by which GCI could provide TWI with a security interest in collateral identified in the DPSA, and in the equipment purchased pursuant to the EPA. (Pl.'s Admis. nos. 9-10; Ramirez Decl., Ex. D (DPSA).) The DPSA allowed GCI to meet its obligations under the EPA by means of promissory notes. (*See* Ramirez Decl., Ex. D (DPSA §§ (1)-(2)).)

In section (4)(d) of the DPSA, GCI represents: "This Agreement and the Related Documents have been properly executed on behalf of Buyer and, upon execution by Seller, this Agreement and the related documents and the transactions contemplated by it, will be the valid and binding obligation of Buyer . . . ." (*Id.*) Section (2)(e) defines "Related Documents" as including the EPA. (*Id.*) The DPSA also contained the following waiver provision, set forth as section (12):

> No failure by Seller to insist upon the strict performance of any term, condition, covenant or agreement of this Agreement or of the Related Documents, or to exercise any right, power or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant or agreement of any such breach, or preclude Seller from exercising any such right, power or remedy at any later time or times. By accepting payment after the due date of any sum due under

this Agreement, Seller shall not be deemed to have waived the right either to regular payment when due of all other sums due under this Agreement or Related Documents, or to declare a default for failure to effect such payment of any such other sum due Seller.

(*Id.*)

### F. Promissory Notes Entered into Pursuant to DPSA

Pursuant to the DPSA and a subsequent amended version of it,[2] GCI executed promissory notes in TWI's favor on August 24, 2001, September 18, 2001, and October 31, 2001, in the aggregate amount of $1,162,959, in exchange for equipment described on the addenda to the first two promissory notes. (Pl.'s Admis. nos. 11-16; Ramirez Decl., Exs. E, G, H.) The due dates of the three Promissory Notes were November 15, 2001, December 28, 2001, and January 29, 2002, respectively. (Ramirez Decl., Exs. E, G, H.) GCI never made payment pursuant to any of these three promissory notes, or the EPA or DPSA. (Pl.'s Admis. nos. 17-21.)

GCI president Gonzales testified during his deposition that he believed that GCI was only bound to pay TWI out of its revenues earned from the Guinea project, and that there was no obligation on GCI's part to make payments to TWI aside from what could be paid out of such revenues. (*See* Gonzales Dep. 44:2-7.) Gonzales concedes that this understanding is not manifested in the parties' written agreements, but was instead what he had personally understood from conversations with TWI employees "as to how the overall project was going to go." (*Id.* 44:17-20.) Gonzales testified:

> We were given an Excel spreadsheet type format from Titan showing them being paid back with an accelerated payment of–via revenue for the overall project. . . . [W]e were talking and we were trying to formulate how to write it up, but we were talking that we would get a grace period while the equipment was in a beta test mode, so to speak, but generate revenue in a beta mode while we were doing the acceptance test, and then we would begin to pay a repayment based on revenues. This was formulas that Titan introduced as ways to move forward.

(*Id.* 44:20-45:6.) No written agreement to this effect was created.

### G. Project Failure and Involvement of Geolution

Former TWI Director of Contracts Ramirez declares that, near the end of 2001, TWI ceased providing GCI with further equipment, and confined its role to assisting GCI with installation and

---

[2]*See* Ramirez Decl., Ex. F, which raised the maximum aggregate principal amount of GCI's promissory notes to $1,250,000, from the original DPSA's cap of $330,000.

operation of the equipment it had already provided. (Ramirez Decl. ¶ 20.) In the summer of 2002, Gonzales states that he "was advised that TWI was going out of business," and that GCI would commence working with "a new company, which would be staffed by soon-to-be ex-employees of TWI in order to get the project up and running." (Gonzales Decl. ¶ 26.) The new company was Defendant Geolution. Former TWI CEO O'Rourke testified that Gonzales still did not have a functioning telecommunications system at that time. (Fourth Shiner Decl., Ex. A (O'Rourke Dep. 106:15-21).) O'Rourke further testified that he had "no understanding" as to what GCI was to do at that time with the equipment it had purchased and which was in Guinea. (*Id.* 106:22-107:10.)

On May 20, 2003, GCI and Geolution entered into a Memorandum of Understanding by which they "acknowledge[d] and agree[d] that it may be in their respective interests to work together on telecommunications projects, including without limitation the operation of a GSM system in Guinea . . . ." (*Id.*, Ex. C.) It is undisputed that although GCI and Geolution discussed a possible business relationship, they never executed a binding, valid contract. It is also undisputed that there was no oral agreement between GCI and Geolution, and that Geolution never billed or received payment from GCI. GCI did not execute any written contract with Defendants other than the EPA, the promissory notes, and the DPSA (original and amended versions). (Pl.'s Admis. no. 27.)

Gonzales declares: "It was not until 2003 that I finally figured out that neither TWI nor Geolutions [sic] (the company that TWI left behind to deal with warranty issues) had the capacity or desire to complete the project." (*Id.* ¶ 25.) However, an extremely public failure of the telecommunications system occurred in December of 2001, which Gonzales recounted in a letter sent to TWI in-house counsel Cheryl Barr on February 11, 2003:

> There have been many embarrassments in front of the Guinean governmental officials due to Titan's blunders and back door antics as well. The December 2001 embarrassment ranks the top of the list of incidences, at that time I along with one of your Titan representatives were in Guinea, as this was going to be the time that we were going to make the first transmission with the use of the Satellite equipment. The Minister of Communication and Directors of the Telephone Company were present along with the media to witness the event and we could not get the system to work. The Nuera equipment would not function and the RF unit failed: both had to be sent back to America. This was very disappointing and extremely embarrassing.
>
> I contend that Titan Wireless has not perform [sic] and in fact has caused me to

>    suffer financial damages and national embarrassment since our inauguration was televised in Guinea on national television December of 2001. The results of this non performance are loss of market opportunity, up front expenses, license fees paid for 2002, legal fees paid, and accounting fees paid, to name a few.

(Barr Decl., Ex. C (Letter of Alfred Gonzales to Cheryl Barr (2/11/03)).)

According to Gonzales, "what I know now is that Titan Wireless was struggling financially and had never turned a profit which made it quite unlikely that they would be able to fulfill their end of what I understood to be our bargain: that they would provide a fully functional, integrated V-SAT and GSM system and would get paid out of proceeds from revenue." (Gonzales Decl. ¶ 18.) Former TWI vice president Jorge Valerdi declares that in November of 2001, "it is my opinion that TWI did not any longer have the ability to deliver a satellite turn-key system or GSM network." (Third Shiner Decl., Ex. A ¶ 5.) Valerdi opines that "TWI, without taking into consideration GCI's needs, substantially changed the terms of the agreement from a turn-key to an equipment sale (or equipment-delivery only), even though it knew that GCI was relying solely on TWI's professed expertise in designing, integrating, and installing these telecommunications systems." (*Id.*) Valerdi states:

>    In my view, there were two key contractual failures: 1) no acceptance tests were conducted, and 2) no technical documentation was produced or released to GCI on TWI's proprietary software and how was the system engineered. . . . In my opinion, by having TWI abandon the technical support and withholding key technical documentation, it was very predictable that GCI would not succeed when attempting to get the telecommunication system to work. The GCI Guinea project was destined to fail. And it did during the failed attempt to get the Conakry site to work in December of 2001 when we traveled to Guinea for its inauguration.

(*Id.* ¶ 6.)

According to Valerdi, TWI CEO O'Rourke and TWI's project managers had taken the position that since GCI had not paid for all of the equipment, it was not entitled to the manuals. (*Id.*) Defense expert Neil Cox, however, testified during his deposition that it is customary in the telecommunications industry to sell documentation and equipment separately. (Fifth Shiner Decl. (*See* Cox Dep. 42:6-22.) Cox further opines that TWI never had any duty to ensure that a network was up and running, stating that the purpose of the Acceptance Test Plan, for example, was to ensure that the equipment sold met manufacturer's standards, "not [those] of a network." (*Id.* 51:23-25, 54:17-20 ("they are going to demonstrate that the manufacturer's equipment can be used

in the intended integration network. It doesn't say they are going to integrate the network.").)

Valerdi describes TWI as having been "keenly interested in one thing: showing sales on its books. In furtherance of this goal, TWI kept doing business with GCI with the express knowledge that GCI did not have its financing in place." (Third Shiner Decl., Ex. A ¶ 12.) Valerdi asserts that "[t]here is no doubt that TWI went into and signed the Equipment Purchase Agreement dated June 19, 2001 with full knowledge of the lack of funding that existed for this project and indeed signed the rest of the documents . . . [with knowledge] that without having an ability to successfully install and generate traffic from the equipment it was sold, [GCI] could not repay the debt." (Third Shiner Decl., Ex. A ¶ 12.) Valerdi states that when CEO O'Rourke approved a quadrupling of GCI's credit limit from $300,000 to $1.2 million, despite GCI's known inability to pay, "it became clear to me that the companies (Titan, Titan Wireless) were far more interested in reporting revenue than with actually getting the project working." (*Id.* ¶ 26.) Valerdi declares:

> All of the actions that I personally remember undertaken by TWI in connection with its "efforts" to assist GCI indicated that TWI wanted to ship as much equipment to GCI as possible so that they could report sales to the COO of Titan Corporation, . . . Eric De Marco. It is the standard in the industry that in order to book a sale, a Note must be signed and shipment must occur. In GCI's case, we later learned that the equipment shipped was done in a hurry and incomplete, causing multiple delays to the project and extra shipments to Guinea, with its considerable expenses.

(*Id.* ¶ 15.)

Like Valerdi, former GCI project manager Mark Jack attributes the project's failure to TWI's

> [decision] to change this from a business partnership to just an equipment sale. At that point we lost pretty much all our support. The technical expertise on our part was not there. We didn't have that type of background. So, it became very difficult then to get the network up and running. . . . I think if they would have continued to be partners with us we could have been up and operational.
> Q. At the end of the day it wasn't so much the failure of the equipment itself as much as the change in who was doing the installation; is that right?
> A. Generally I would say that is correct. . . . I just think in this instance the configurations that were put into the equipment were not correct and we didn't have the right people trying to integrate them to make everything work properly.

(Sixth Shiner Decl., Ex. A (Jack Dep. 92:24-93:19.)

Defense expert Cox testified that if all of the equipment listed in the SOW Matrix had been properly deployed, it would have gotten network traffic up and running. (*See* Fifth Shiner Decl., Ex. A (Cox Dep. 62:19-63:6.) Although conceding that the equipment was not all shipped, Cox

attributed responsibility for this to GCI on the grounds that it had failed to pay. (*See id.* 63:20-25.) When GCI's attorney pointed out to Cox that GCI's payment for equipment under the $1.2 million October 31, 2001 Promissory Note was not due until January of 2002, Cox stated that GCI was nevertheless responsible for the failure to ship the equipment because it had failed to ready the physical facility for delivery. (*See id.* 64:24-65:21.) Cox did not deny that TWI had a responsibility to ship equipment; he instead explained why, in his opinion, the failure to ship equipment had been proper. (*Id.* 66:16-19.)

On November 8, 2001, Valerdi, who was then still a vice president at TWI, sent an email to other TWI employees, including then-CEO Eugene (Gene) O'Rourke, stating:

> Gene and Chris do not want us to invest any more time on this project until we get some tangible assurance that GCI has their funding secured, and that we are going to get paid out of those funds as "first in line." Therefore, I am pushing GCI to move on using his own resources to start the installation of the earth stations while we are in the holding pattern. My objective is to continue to move those assets in place and get some traffic moving. We have secured the right to their revenue to pay for those assets, in the event that there is more delays on his funding, beyond December.

(O'Rourke Decl. in support of Defendants' 2005 Motion for Summary Judgment, Ex. G.)

### H. Litigation History

GCI filed the instant lawsuit on January 23, 2004. It propounded no written discovery of its own, while failing to respond to Defendants' written discovery. This resulted in Defendants' Requests for Admissions being deemed admitted, and GCI's objections to Defendants' interrogatories being waived. Prior to the last summary judgment motion brought by Defendants, discovery was limited to fraud issues. At this time, all discovery has closed.

### III. Legal Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may meet this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party satisfies its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (internal quotations omitted).

In ruling on a motion for summary judgment, "[t]he district court may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the Court is not obligated to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. "Credibility determinations [and] the weighing of evidence . . . are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

**IV.  Discussion**

    **A.  <u>GCI's Claims Are Barred by the Time and Liability Limitations Set Forth in the TCOS</u>**

        **1.  <u>The Limitations Set Forth in the TCOS Are Binding</u>**

In its July 11, 2005 Order, the Court ruled, with respect to Defendants' motion for summary judgment on GCI's claim for consequential, punitive or exemplary damages: "In order to find for Defendants, at summary judgment, this Court would have to find that (1) the EPA was validly formed and enforceable against Plaintiff, (2) that the terms and conditions cited by Defendants are properly incorporated into the EPA, and (3) that Plaintiff lacked any defenses to enforcement of the EPA or the particular terms at issue." (Doc. no. 51 at 12.)

### a. GCI Has Failed to Raise a Genuine Issue of Material Fact as to whether the EPA Was Validly Formed and Enforceable

The Court finds that TWI has carried its burden with evidence that the EPA was validly formed, and GCI has failed to come forward with evidence which would show that the EPA was not validly formed and enforceable. GCI negotiated and executed the EPA with the assistance of counsel, who prepared a memorandum for GCI analyzing its terms. GCI has failed to set forth any evidence, or articulate any viable argument, that would establish a defect in the formation of the EPA, so as to render it unenforceable.

GCI asserts that the EPA never became effective because GCI did not obtain a letter of credit. (*See* doc. no. 51 at 12 n. 11.) At this stage in the proceedings, the Court finds no material facts to support this position. The DPSA expressly stated that the EPA remained in effect despite GCI's failure to obtain a letter of credit, and Gonzales testified in his deposition that the payment arrangement created by the DPSA was a "substitute" for the letter of credit called for in the EPA. (*See* Gonzales Dep. 95:7-12.) Moreover, the DPSA provides that waiver by TWI of any term under the DPSA or EPA would not serve to waive performance of any term under the contract. (*See* Ramirez Decl., Ex. D.) GCI has pointed to no evidence in the record from which a finder of fact could conclude that GCI's failure to obtain a letter of credit rendered the EPA, or any of its attachments, ineffective.

### b. The TCOS Are Incorporated into the EPA

The EPA expressly states that it includes the TCOS. GCI's lawyers made extensive comments regarding the TCOS in the memorandum they prepared prior to GCI's execution of the EPA. GCI has set forth no basis for its position that the TCOS was not part of the parties'

agreement, nor does the Court find one.

### c. GCI Has Set Forth No Defenses to Enforcement

GCI's Opposition to the instant Motion sets forth no defenses to enforcement of the TCOS. Although GCI contends that TWI breached certain of its obligations under the EPA, it fails to explain how this would have extinguished the liability limitations set forth in the incorporated TCOS. GCI has raised no genuine issue of material fact as to whether the TCOS are a binding part of the parties' agreement.

### 2. The TCOS Foreclose GCI from Recovering on Its First, Fourth, Fifth, Sixth, and Eighth Causes of Action

The TCOS preclude recovery against TWI under any theory at law, in equity, or otherwise, for "any special, exemplary, punitive, incidental, indirect, or consequential damages (even if Titan Wireless has been advised of same) including, without limitation lost profits or revenues." (Ramirez Decl., Ex. C.) Furthermore, the TCOS limit TWI's entire liability under any claim arising out of the EPA or its subject matter, to "the sum of the payments actually made by purchaser to Titan Wireless pursuant to this Agreement." (*Id.*) Lastly, the TCOS require that "[a]ny action against Titan Wireless must be brought within one (1) year after the claim arose." (*Id.*)

It is undisputed that GCI made no payments pursuant to the EPA, the DPSA or the promissory notes. The damages GCI seeks are punitive and consequential damages. This precludes recovery by GCI for its First (declaratory relief), Fourth (negligent misrepresentation), Fifth (unjust enrichment), Sixth (breach of contract against TWI), and Eighth (breach of implied covenant of good faith and fair dealing against TWI) causes of action, all of which arise from the EPA and/or its subject matter.

Even if this were not the case, GCI's claims are barred by the TCOS's one-year limitations period. Under California law, "a cause of action for breach accrues and the statute of limitations begins to run at the time of breach." *Ahmadzai v. Metully*, No. CIVS-05-1091LKKJFMPS, 2005 WL 2219215, * 2 (E.D. Cal. Sept. 12, 2005) (citing *Mortkowitz v. Texaco, Inc.*, 842 F. Supp. 1232, 1237 (N.D. Cal. 1994)); *see also Niles v. Louis H. Rapoport & Sons*, 53. Cal. App. 2d 644, 651 (1942) (same); *but see April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 823-24 (1983)

(breach of contract claim accrues when the plaintiff incurs "appreciable harm" as a result of the breach). "Additionally, under the 'discovery rule,' if breaches of contract are 'committed in secret,' the claim accrues when the 'harm flowing from those breaches [is] reasonably discoverable.'" *Turtle v. Castle Records Inc.*, No. 03-3922MMC, 2005 WL 1159419, * 2 (N.D. Cal. May 17, 2005) (citing *April Enterprises*, 147 Cal. App. 3d at 832).

GCI has taken the position that Defendants' failure to integrate hardware and software caused Plaintiff damage in December of 2001, when the system failed to work at the televised grand opening of the satellite network in Guinea. Additionally, GCI contends that TWI prematurely stopped meeting its obligations under the contract in November of 2001. Gonzales's letter to TWI's in-house counsel states: "I contend that Titan Wireless has not perform [sic] and in fact has caused me to suffer financial damages and national embarrassment since our inauguration was televised in Guinea on national television December of 2001." (Barr Decl., Ex. C.) Regardless of whether the cause of action accrued at the time of the alleged breach, or when "appreciable harm" resulted from it, GCI has taken the position that TWI failed to perform and caused GCI to incur appreciable harm in December of 2001, as a result of the public failure of the telecommunications system. Furthermore, even if the Court were to apply the "discovery rule," the alleged breaches were obvious and therefore reasonably discoverable in December of 2001. Therefore, GCI's own allegations and admissions demonstrate that the breach of contract claim against TWI arose more than one year before GCI filed its Complaint on January 23, 2004. In addition, GCI has failed to point to specific facts that would establish a breach occurring within the year prior to January 23, 2004.

### 3.     GCI's Breach of Contract Claim Against Geolution Fails

"A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Careau & Co. v. Security Pacific Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990). It is undisputed that no contract existed between Geolution and GCI. Accordingly, Geolution cannot be liable for breach of contract. GCI's seventh cause of action fails as a matter of law.

In conclusion, the Court grants Defendants' summary judgment motion with respect to GCI's remaining causes of action.

### B.     Defendants' Counterclaims

Defendants have moved for summary judgment against GCI on their counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. Defendants base these counterclaims on the undisputed facts that TWI provided GCI with equipment and services under the EPA for which GCI never provided payment.

#### 1.     Breach of Contract and Implied Covenant of Good Faith and Fair Dealing

Defendants' counterclaim for breach of contract asserts that TWI performed all obligations under the parties' written agreements (including the EPA, DPSA, Amended DPSA, and three promissory notes), or, alternatively, that TWI was excused from performing such obligations; that GCI breached the agreements by, among other things, failing to pay the amounts owed TWI under the promissory notes; and that, as a foreseeable result, TWI suffered monetary losses. (*See* Answer to First Amended Complaint and Counterclaims ¶¶ 46-50; Mot. for Summary Judgment at 20-21.) In its Opposition, GCI simply contends that the EPA never came into effect, and does not squarely address the elements of Defendants' breach of contract claim.

However, the Court concludes that a genuine issue of material fact exists as to whether TWI performed, or was excused from performing, its obligations under the contract, as required to maintain its causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. *See Careau & Co.*, 222 Cal. App. 3d at 1388; *Taldan Inv. Co. v. Comerica Mortg. Corp.*, 1990 U.S. Dist. LEXIS 19951 (N.D. Cal. Dec. 3, 1990). GCI's promissory notes came due on January 29, 2002. (Ramirez Decl., Ex. H.) A genuine issue of material fact exists as to whether TWI failed to provide equipment and services pursuant to the EPA both prior to and after that time. The evidence that TWI discharged its technical staff while rushing to book equipment sales and voluntarily increasing GCI's credit limit–despite its knowledge that GCI had no funding in place and lacked the technical capacity to get the equipment up and running–also raises a genuine issue of material fact as to whether TWI fulfilled its contractual obligations in good faith. Accordingly, the Court denies Defendants' motion for summary judgment on their

counterclaims for breach of contract and breach of the covenant of good faith and fair dealing.

## 2. Unjust Enrichment

The elements of an unjust enrichment claim are (1) receipt of a benefit, and (2) unjust retention of the benefit at the expense of another. *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000). In support of their counter-claim for unjust enrichment, Defendants have established that they provided GCI with equipment for which GCI failed to pay, and that GCI has retained that equipment. GCI has set forth no evidence that would raise a genuine issue of material fact as to either element of this counterclaim. Accordingly, the Court grants summary judgment on Defendants' counterclaim for unjust enrichment.

## V. Conclusion

For the above reasons, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment (doc. no. 84) as follows. The Court **GRANTS** summary judgment in Defendants' favor on all of GCI's remaining causes of action, and on Defendants' counterclaim for unjust enrichment. The Court **DENIES** summary judgment on Defendants' counterclaims for breach of contract and the covenant of good faith and fair dealing. The Court further **ORDERS** the parties to arrange for a case management conference with Magistrate Judge McCurine to set the pretrial conference date, the deadline for the pretrial order, and to evaluate the case and the need for supervision of settlement discussions.

**IT IS SO ORDERED**.

DATED: October 3, 2006

**WILLIAM Q. HAYES**
United States District Judge